UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

   SG BLOCKS, INC.,

                    Debtor.

------------------------------------------------------------x
In re:

   SG BUILDING BLOCKS, INC.,

                    Debtor.

------------------------------------------------------------x
In re:

   ENDAXI INFRASTRUCTURE GROUP, INC.,

                    Debtor.

------------------------------------------------------------x

Chapter 11

Case No. 15-12790 (JLG)

Chapter 11

Case No. 15-12971 (JLG)

Chapter 11

Case No. 15-12792 (JLG)

**DECLARATION OF PAUL GALVIN UNDER
LOCAL RULE 1007-2 IN CONNECTION WITH CHAPTER 11 FILING,
AND LOCAL RULE 9077-1 IN SUPPORT OF CERTAIN "FIRST DAY" MOTIONS**

Paul Galvin declares pursuant to 28 U.S.C. § 1746 as follows:

**BACKGROUND**

1. On October 15, 2015 (the "**Petition Date**"), SG Blocks, Inc. ("**SG Blocks**"), SG Building Blocks, Inc. ("**Building Blocks**"), and Endaxi Infrastructure Group, Inc. ("**Endaxi**" and, together with SG Blocks and Building Blocks, the "**Debtors**"), each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**") in this Court. The Debtors are authorized to continue to operate and manage their businesses and property as debtors in possession under Bankruptcy Code §§ 1107(a) and 1108.

2. I am the Chief Executive Officer of SG Blocks, and serve on its Board of Directors. I am also the Chief Executive Officer and a Director of Building Blocks and Endaxi.

**Nature of Debtor's Business Generally**

3. The Debtors' primary business is to work with architects, developers, builders, and commercial clients to design and build code-engineered, modified cargo shipping

containers to meet the growing demand for safe and green construction. Rather than consuming new steel and lumber, the Debtors capitalize on the structural engineering and design parameters a shipping container must meet and repurposes them for use in construction of new structures. The Debtors' containers are used in residential, commercial, and military structures, including major fast food and retail chain locations.

4. The Debtors work closely with third party partner companies to source materials for each project need, and the Debtors provide their technical experience and expertise to assist their partners to meet the client's exact specifications. The Debtors do not perform the modifications or deliveries themselves, but rather all manufacturing and logistics are handled by third party partners.

5. On July 23, 2007, the Debtors entered into an exclusive, 10-year Collaboration and Supply Agreement with ConGlobal Industries, Inc. ("**ConGlobal**") to provide the Debtors with materials, supplies, and labor for all of their domestic orders. ConGlobal is also a minority shareholder of SG Blocks, owning less than five (5%) percent of SG Blocks' outstanding common stock.

**The Debtors' Current Ownership and Structure**

6. SG Blocks is a publicly traded company, which has approximately 107 shareholders.

7. SG Blocks owns 100% of the stock of Building Blocks and Endaxi, as well as 99.99% of the stock of SG Blocks Sistema De Constucao Brasileiro LTDA ("**SG Brazil**").

8. Building Blocks and Endaxi are not operating entities, and the Debtors do not believe that either Building Blocks or Endaxi have any assets or liabilities, except as guarantors on the pre-petition secured debt of SG Blocks (described below).

9. SB Brazil was formed in 2011 to explore potential business opportunities in Brazil, and is currently inactive.

**Prepetition Secured Debt**

10. Between April 2014 and the Petition Date, through a series of Securities Purchase Agreements, Securities Exchange Agreements, and the issuance of Senior Convertible Debentures, SG Blocks obtained secured financing from Hillair Capital Investments L.P. ("**Hillair**"), Dillon Hill Capital, LLC ("**Dillon**"), Dillon Hill Investment Company, LLC ("**DHIC**"), Frank Casano ("**Casano**"), Scott Masterson ("**Masterson**") and Marc Nuccitelli ("**Nuccitelli**", and with Hillair, Dillon, DHIC, Casano, and Masterson, collectively, the "**Prepetition Lender**") in the aggregate amount of $5,405,010.00. Both Building Blocks and Endaxi are guarantors on all debts owed by SG Blocks to the Prepetition Lender.

11. As of the Petition Date, the entire aggregate amount of the secured debt owed to the Prepetition Lender remains outstanding.

12. In connection with the filing of the Debtors' cases, the Debtors have filed a motion seeking authority to use the Prepetition Lender's cash collateral during the pendency of the case. As set forth below, I believe there are strong and cogent reasons why the Court should grant the Debtors' motion. I am also advised that the Prepetition Lender does not object to the Debtors' proposed use of cash collateral.

**The Debtor's Liabilities and Assets**

13. As of October 15, 2015, the Debtors, on an unaudited basis, have total assets of approximately $332,209.21. Their total liabilities, including the $5,405,010.00 in secured debt owed to the Prepetition Lender, are approximately $5,774,929.09.

14. The Debtors' gross revenue in 2013 was approximately $5,732,776, and increased in 2014 to $6,036,953. However, the Debtor sustained net losses in 2013 and 2014 of $2,163,302 and $1,537,315, respectively, largely due to the Debtors' efforts to continue to grow in the industry and change industry perceptions with respect to the Debtors' products. In addition, the Debtors have substantially increased their profit margins from 2013 through the Petition Date.

**The Debtors' Troubles and Current Forecast**

15. As stated above, since the formation of SG Blocks in 2011, the Debtors have focused on expanding their business and securing contracts with new customers. The Debtors, as relative newcomers to the industry offering a novel product, have been slow to gain traction with some of their larger target customers, such as fast food restaurants, retail locations, and the U.S. military.

16. However, largely due to the Debtors' marketing efforts and dissemination of information with respect to the Debtors' product, refurbished shipping containers have become an accepted and sought after alternative to traditional materials in construction. The Debtors are optimistic about their business prospects moving forward, as the Debtors currently have 62 outstanding bids on more than $12.7 million in projects, many of which the Debtors believe they will be able to secure. In addition, because of previous successful projects that the Debtors have completed for major customers, the Debtors have seen a recent increase in repeat orders of significant size.

17. Accordingly, the Debtors believe that, with some additional time and the ability to restructure their debts and obtain additional financing, the Debtors can emerge from a chapter 11 case as successful and profitable companies.

**The First Day Motions**

18. On the Petition Date, the Debtors filed certain "First Day" motions seeking emergency relief. As set forth below, I believe that obtaining the relief requested in each of the First Day motions is critical to avoid irreparable harm to the Debtors, their businesses, and their prospects for maximizing the value of their businesses as a going concern.

**Application to Authorize the Debtors
to Use Cash Collateral and Obtain
Debtor In Possession Financing**

19. The application seeking authority to use cash collateral and obtain debtor in possession financing is essential to the Debtors' continued operation of their businesses. As

described above, the Debtors continue operate and believe that, due to the substantial number and dollar amount of outstanding bids, their businesses will begin to be profitable in the near future and the Debtors' value as a going concern can be preserved.  However, the Debtors require access to emergency debtor-in-possession financing to immediately remedy their illiquidity, secure their outstanding bids, and fulfill customer orders.

20. The Debtors expect to move quickly to put forth a plan of reorganization.  In the interim, the Debtors' operations require sufficient levels of working capital to fund and support ordinary business expenditures, including payroll, expenses for building and shipment of orders, taxes and other necessary overhead costs.

21. Absent access to emergency financing, the Debtors will not have sufficient liquidity to continue production and order fulfillment, resulting in immediate and irreparable harm to the Debtors' creditors, their estates, and employees.  Implementation of the post-petition financing arrangements summarized in the Debtors' motion at the onset of these cases is critical to avoid immediate and irreparable harm to the estates, and to support Debtors' effort to maximize the estates for the benefit of all creditors and parties-in-interest.

22. For these reasons, and as more fully described in the Debtors' motion, the Debtors seek entry of interim and final orders authorizing the Debtors to use cash collateral and obtain debtor in possession financing.

**Motion Seeking an Order Directing Joint
Administration of the Debtors' Cases**

23. By this Motion, the Debtors seek an entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).

24. The Debtors' believe that joint administration is warranted in these cases and will avoid the preparation and replication of duplicative notices, applications and orders, thereby saving the estates considerable expenses and resources.  The Debtors' business operations

are closely related and many of the motions made on behalf of each of the Debtors will affect all of the Debtors.

25. For these reasons, and as more fully described in the Debtors' motion, the Debtors seek entry of an order directing the joint administration of their chapter 11 cases.

**Motion for an Order Authorizing**
**Continuation of Certain Customer Practices**

26. The motion seeks entry of an order pursuant to Bankruptcy Code §§ 105(a), 363(b) and 503(b)(1) and Bankruptcy Rule 6003, authorizing the Debtor to honor certain customer deposits and business practices in the ordinary course of business (the "**Customer Practices**").

27. Prior to the filing of the Debtors' chapter 11 cases, in the ordinary course of their businesses, the Debtors received certain deposits on orders placed by its customers (the "**Deposits**"). The Deposits were used to help cover the necessary costs of modifying and transporting the Debtors' shipping containers. Upon receipt of the final product, customers were responsible for payment of the remaining amount of the purchase price. Further, the Debtors may have prepetition warranty claims that they may wish to address during the case in order to preserve customer relationships.

28. The Debtors' businesses, and ultimately the Debtors' ability to successfully reorganize, are dependent upon the continued satisfaction of their customers. In fact, a large percentage of the Debtors' business is based upon repeat purchases by the same customers or related entities.

29. In this regard, the Customer Practices are critical to the continued operation and success of the Debtors' businesses. Any delay or failure in honoring the Deposits, for even a brief time, may irreparably impair customer relations and possibly cause the loss of valuable, repeat customers. In the event that there is any lapse in honoring the Deposits, the Debtors' businesses face irreparable harm to their value as a going concern, and ultimately their efforts

to reorganize.

30.   I estimate that the total amount of prepetition Deposits is approximately $13,560.00, which were down payments on orders totaling $65,050.00.

31.   For these reasons, and as more fully described in the Debtors' motion, the Debtors seek authority to continue to honor the Customer Practices.

**Information Required By Local Rule 1007-2**

32.   It is my understanding that Local Rule 1007-2 requires the Debtor to disclose certain information relating to the Debtor's assets, liabilities and financial condition. That information is set forth in **Exhibit A** annexed hereto.

## CONCLUSION

33.   The Debtors believe that under the protection of this Court, they will be able to maximize the value of their assets for the benefit of creditors and other stakeholders, and restructure their businesses in order to successfully emerge from chapter 11.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15, 2015

**SG BLOCKS, INC.**

By:   *s/ Paul Galvin*
      Paul Galvin
      Chief Executive Officer

**SG BUILDING BLOCKS, INC.**

By:   *s/ Paul Galvin*
      Paul Galvin
      Chief Executive Officer

**ENDAXI INFRASTRUCTURE GROUP, INC.**

By:   *s/ Paul Galvin*
      Paul Galvin
      Chief Executive Officer